# In the

# United States Court of Appeals

## For the Seventh Circuit

No. 07-3243

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JEFFREY R. BERRY,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 03 CR 961—**James B. Zagel,** *Judge.*

ARGUED FEBRUARY 23, 2009—DECIDED MAY 13, 2009

Before EASTERBROOK, *Chief Judge*, and KANNE and
EVANS, *Circuit Judges.*

EVANS, *Circuit Judge.* Trial judges sometimes find
themselves between a rock and a hard place. Our system
is one of competing rights and interests, and it falls
upon judges to strike the appropriate balance. When
judges render their decisions, one side may feel disap-
pointed, the other satisfied; one party may consider an
appeal, the other is happy to stand pat. Occasionally,
though, we see a shift in this pattern. In certain situations,

the law is structured so that a party has grounds to appeal *regardless* of whether the judge ruled for *or* against him. The case we consider today is a pretty good example of that phenomenon.

Jeffrey Berry, the defendant in a criminal fraud case, insisted on representing himself at trial. Often a fool's move, the judge had more reason than usual to question the decision because Berry showed signs of delusion. Hemmed in by the Constitution on both sides—a defendant in a criminal case has the right to represent himself, but he can't even stand trial if he is so wanting for mental competence that the proceedings would be fundamentally unfair—the district judge here did the best he could with the hand that was dealt to him. The judge allowed Berry to run the show but only after satisfying himself that Berry was mentally competent. Now that Berry's legal skills have proved unequal to the task, he asks us to overturn his conviction, arguing that the judge should not have allowed him to proceed *pro se*. We are sure that if the judge had refused Berry's request, forced a lawyer down his throat, and a jury ended up convicting him, we would see an appeal just the same.

Berry's path to court started in 1997 when he founded a sham business called "B & B Consulting, Ltd." The fraud was fairly simple. Berry told several would-be entrepreneurs that he had access to billions of dollars in funding just waiting to be used. His clients simply had to pay an advance fee, usually in the neighborhood of $25,000, and they could obtain loans of virtually unlimited size.

Incredible as that may sound, Berry spun a yarn that managed to convince no fewer than 12 victims. He claimed to have connections with Phillips Electronics, the International Monetary Fund, President Bill Clinton, the Treasury Department, and several international banks. So through little more than name-dropping, financial jargon, and unflappable confidence, Berry secured the advance fees. And when he failed to deliver on his promises of funding and his victims started to grumble, he just made up a new story. He ensured his clients that the money was on its way, but global events (like tensions in the Middle East and the G-7 Conference) were slowing things up a bit. In reality, Berry was just withdrawing the funds as they came in, turning an overall profit of nearly $150,000.

The gravy train came to a screeching halt in 2003, however, when the government charged Berry with wire fraud. He was convicted after a jury trial and sentenced to 11 years in custody followed by 5 years of supervised release.

But the important thing for us is neither the crime nor the outcome. As we say, Berry chose to represent himself at trial, and now he contends the court should have prohibited that. Berry (now, of course, with top-notch lawyers—Colleen Sorensen and Paul Garcia—from Chicago's Kirkland and Ellis law firm) claims the record is rife with evidence that he lacked competence to act as his own counsel. The district court ignored this evidence, Berry argues, because the judge believed Berry had an "absolute right" to represent himself. As Berry sees it, the

court thought that so long as he was competent to stand trial it had no choice but to indulge his pleasure. In light of *Indiana v. Edwards*, ___ U.S.___, 128 S. Ct. 2379 (2008), he says that view is constitutionally flawed.

To be sure, Berry consistently behaved in a bizarre manner. Beginning with a slew of *pro se* motions filed in 2004, Berry made statements that we can only generously call absurd. (Berry was represented by three different lawyers from 2004 to 2006, but the vast majority of motions he filed were *pro se*.) He said he met with Condoleezza Rice at the White House; that Citibank robbed him of $420 million (perhaps this is not as far-fetched as it seems given the situation in the spring of 2009!); that he was in the process of "[n]egotiat[ing] to reduce [o]il prices and create millions of jobs in America"; that he drafted an international treaty; that two bankers (former associates) were killed after working with him, and his own life was in danger due to some sort of global financial conspiracy; that he was business partners with the "controller of the space station"; that he represented the governments of China, Russia, and Taiwan, and had met with finance ministers all over the word; and that Bill Clinton and Boris Yeltsin had personally made promises to him.

No doubt troubled by these statements, the district court ordered Berry to undergo an examination in July 2004 to determine his competency to stand trial. After interviewing Berry, speaking with his attorney and spouse, and reviewing his *pro se* filings, Dr. Ron Nieberding concluded that Berry understood the charges

against him and was fit to proceed. Berry himself agreed—"I believe I am competent," he told the doctor—and so did the judge. Berry's mental health history and life story supported this determination. Berry attended college for several years (though he failed to graduate); seemingly had healthy relationships with his wife and children; generally steered clear of drugs and alcohol; never sought professional therapy; and was never prescribed psychotropic medication. Although Berry maintained his grandiose story during the competency exam, Dr. Nieberding did not believe he was suffering from a "delusional (false belief) process." Berry didn't exhibit any symptoms "consistent with a mental disease or defect." His only real problem, rather, was "a tendency toward overconfidence"—not too surprising for a con(fidence) man.

As the case slowly moved towards trial, Berry continued his onslaught of ridiculous statements. He burned through three attorneys in as many years, until finally he decided to go it alone. Just as the fourth attorney was set to make his initial appearance, Berry informed the court (on March 8, 2007) that he'd had enough and wished to proceed *pro se*. The judge took the request seriously, respecting Berry's choice but ensuring that he knew the risks. The conversation went like this:

> THE COURT: Mr. Berry, you've indicated to me that you wish to represent yourself in this case, is that true?
>
> DEFENDANT BERRY: Yes, it is.
>
> THE COURT: I'm required by law to explain certain things to you. . . . And even if I weren't required by

law, I'd explain them anyway. . . . And basically this amounts to a warning that it's almost never a good idea to represent oneself in any kind of case and particularly in criminal cases.

I've had occasion now to read several of the papers you have filed with me, . . . and I have to tell you that my impression is that you have very little understanding of the law, very little understanding of the rules of evidence, very little understanding of what would be relevant in the nature of a defense. There's nothing that indicates to me that you have any ability to examine a witness or to cross examine a witness. I believe that evidence to which you might have a valid objection might be offered and I believe you would not know that you had the right to object or how to object. In short, I believe that representing yourself in this case, particularly this kind of case which deals with financial issues, is a very unwise and a very foolish thing for you to do. I want you to understand that that is my opinion. Do you understand that?

DEFENDANT BERRY: Yes, I do.

THE COURT: In addition to my belief that you would be unable to defend[ ] yourself adequately, I also believe that if something went on during the course of the trial that was an error, something where you have the right to appeal, you know so little about the law that you would be unable to preserve the record to permit you to appeal even an error that was unmistakably wrong. Do you understand what I've just said to you?

DEFENDANT BERRY: Yes, I do.

THE COURT: The other thing is . . . I do not be-lieve—and I'm particularly clear about this based on what I've heard from you before—that if you had a good defense to these charges and you wanted to put on evidence to establish that defense, you would not know how to do it, and as a consequence even if you had a valid defense, you may be unable to make it to the jury which would try this case. Do you understand that that is my opinion?

[DEFENDANT BERRY:] Yes, I do.

THE COURT: In addition to that, I think you have, obviously, no experience with selecting jurors . . . , and for this reason you may not be effectively able to make challenges for cause to certain jurors or make an informed decision as to exercising peremptory challenges . . . . Do you understand that that is my view of your abilities here?

[DEFENDANT BERRY:] Yes, I do.

THE COURT: And notwithstanding that, notwith-standing the warnings that I've given to you and repeating to you an old legal maxim, which is a lawyer involved—and you're not even a lawyer—a lawyer that defends himself has a fool for a client, despite my warnings to you, do you still desire to represent yourself?

DEFENDANT BERRY: Yes, I do.

Satisfied that Berry was making an informed choice, albeit a foolish one, the judge allowed him to proceed *pro*

*se*. However, the judge urged Berry to consider stand-by counsel, and Berry acquiesced. So, with an attorney in tow but himself at the helm, Berry made his way to trial.

The trial lasted five days before the jury found him guilty as charged. Though his strategy failed, Berry aimed throughout the trial to convince the jury that he was indeed a mover and shaker in global finance. And to the extent his own view of things conflicted with the testimony of prosecution witnesses—experts and otherwise—he chalked it up to their relative ignorance (in comparison to his own sophistication) of things financial.

As far as *pro se* defenses go, it wasn't the worst we've seen. Berry managed to lodge objections, cross-examine witnesses, call a witness of his own, and make opening and closing statements. He didn't call himself as a witness, but by choosing to represent himself he was effectively able to testify throughout the trial without facing cross-examination. But to say that it wasn't an unmitigated disaster for a *pro se* defense isn't saying much. Berry's decision to ride solo was clearly a poor one. At best, his performance served as a distraction from the government's case, doing little (if anything) to undermine it.

The question for us is whether the verdict that came out of these proceedings must be vacated because the court should not have allowed Berry to represent himself. We review that decision for an abuse of discretion, keeping in mind the constitutional principles it implicates. *United States v. Johnson*, 534 F.3d 690, 693-94 (7th Cir. 2008); *United States v. Brock*, 159 F.3d 1077, 1079 (7th Cir. 1998).

We start with due process, which prohibits the trial of a defendant who lacks mental competency. *Drope v. Missouri*, 420 U.S. 162, 171-72 (1975); *Dusky v. United States*, 362 U.S. 402, 402 (1960) (*per curiam*); *United States v. Andrews*, 469 F.3d 1113, 1117 (7th Cir. 2006). Competency to stand trial requires the ability to understand the nature of the proceedings, to consult with counsel, and to assist counsel in preparing a defense. *Drope*, 420 U.S. at 171; *Dusky*, 362 U.S. at 402. Berry, however, does not genuinely dispute that he possessed the mental wherewithal to stand trial. Instead, he says this is beside the point because competency to stand trial does not equal competency to represent oneself *at* trial. Competency to do the latter, Berry contends, requires more.

Is that so? Berry concedes that a criminal defendant has a fundamental right to represent himself. *See* U.S. Const. amend. VI; *Faretta v. California*, 422 U.S. 806, 807 (1975); 28 U.S.C. § 1654. Yet, this right, like so many others, is not absolute. *Edwards*, 128 S. Ct. at 2384 (citing *Martinez v. Court of Appeal of Cal., Fourth Appellate Dist.*, 528 U.S. 152, 163 (2000), *McKaskle v. Wiggins*, 465 U.S. 168, 178-79 (1984), and *Faretta*, 422 U.S. at 834 n.46)). For instance, a defendant can forfeit his right to self-representation by "deliberately engag[ing] in serious and obstructionist misconduct." *Faretta*, 422 U.S. at 834 n. 46. And a defendant can only elect self-representation by "knowingly and intelligently" waiving his right to counsel.[1] *Id.* at 835.

---

[1]  In addition to his main argument—that he lacked competency to represent himself—Berry contends that he did not know-

(continued...)

Needless to say, a defendant who lacks competency to stand trial has no business representing himself. But what about a defendant who has the mental presence to stand trial but who still suffers from a mental defect that could impair his ability to represent himself? Berry says the law takes account of this situation, accommodating such "gray-area" defendants—among whom he counts himself—by imposing a higher standard for electing to proceed *pro se*.

A year ago we could have dispatched this argument summarily. Up to that point, the controlling authority was *Godinez v. Moran*, 509 U.S. 389 (1993). In *Godinez*, the Supreme Court "reject[ed] the notion that competence to plead guilty or to waive the right to counsel must be measured by a standard that is higher than (or even different from) the *Dusky* standard" governing competence to stand trial. *Id.* at 398. The Court said individual states could adopt more demanding standards if they wanted to, but it was a matter of choice, not constitutional dictate. *Id.* at 402. As far as the Constitution was con-

---

[1] (...continued)

ingly and intelligently waive his right to counsel. That is, even if he was competent to make such an election, he says the district court failed to ensure that he knew all the risks. We disagree, so much so that we find it unnecessary to discuss this point at any length. Suffice it to say that a review of the relevant factors, *Johnson*, 534 F.3d at 693-94, and the judge's admonition convince us that Berry "[knew] what he [wa]s doing and his choice [wa]s made with eyes open," *United States v. Avery*, 208 F.3d 597, 601 (7th Cir. 2000).

cerned, defendants competent to stand trial were competent to represent themselves (at least when pleading guilty). Under *Godinez*, then, Berry would seem to lose.

But, as Berry suggests, the Supreme Court's recent decision in *Edwards* requires a deeper analysis. From one perspective, *Edwards* simply confirmed the Court's parting remarks in *Godinez*—that states may force counsel upon an unwilling defendant who, despite competency to stand trial, suffers from a mental illness casting doubt upon his ability to serve as his own lawyer. However, the Court in *Edwards* didn't think *Godinez* settled the matter.

Ahmad Edwards was hauled into state court after a botched armed robbery. His mental condition vacillated throughout the pretrial stages:  the court found him competent to stand trial at one hearing but incompetent on two other occasions as a result of schizophrenia. After eight months of treatment in a local hospital, however, Edwards's condition had improved, and the court decided he was fit to proceed. The court still had doubts about Edwards's mental state, though, and therefore denied his request to proceed *pro se*. On appeal, he argued that since he was competent to stand trial, Indiana had no right—no constitutional authority—to prohibit him from representing himself. The Supreme Court disagreed, holding that "the Constitution permits States to insist upon representation by counsel for those competent enough to stand trial under *Dusky* but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by them-

selves." *Edwards*, 128 S. Ct. at 2388. *Godinez* didn't dictate that result, in the Court's view, because that decision only dealt with a defendant who wished "to proceed on his own to enter a guilty plea[.]" *Id.* at 2385. The *Godinez* defendant "did not seek to conduct trial proceedings," a task that may require a higher level of competency than simply waiving the right to counsel for purposes of pleading guilty.

The Court's decision in *Edwards* may help Berry in some abstract way, but even then not by much. Building on *Godinez*, the *Edwards* Court took another step towards limiting the right of self-representation. The Court made it clear that the right to proceed *pro se* is anything but absolute. However, in both *Godinez* and *Edwards* the Court talked about what the Constitution permits— limitation of the self-representation right in connection with pleading guilty and presenting a trial defense, respectively—not what it mandates. At some point, presumably, there must be limits to the limitations. If the option to represent onself is to be called a "right," not just a sometimes privilege, it has to be available in the usual course of things. In this respect, we find merit in Justice Scalia's dissent. *See Edwards*, 128 S. Ct. at 2392 ("Until today, the right of self-representation has been accorded the same respect as other constitutional guarantees."). But the upshot for Berry is clear: The Constitution *may* have allowed the trial judge to block his request to go it alone, but it certainly didn't require it. *See United States v. DeShazer*, 554 F.3d 1281, 1290 (10th Cir. 2009) ("Thus, while the district court was not compelled to find Mr. DeShazer competent to waive his right to coun-

sel simply because the court had found him competent to stand trial, it does not follow that the district court was absolutely prohibited from doing so.").

We emphasize the word "may" because *Edwards* does seem to cap a trial court's ability to foist counsel upon the unwilling. "Severe mental illness" appears to be a condition precedent. Certainly, the right to self-representation cannot be denied merely because a defendant lacks legal knowledge or otherwise makes for a poor advocate. *See Faretta*, 422 U.S. at 834 n.46 ("[A] defendant who elects to represent himself cannot thereafter complain that the quality of his own defense amounted to a denial of 'effective assistance of counsel.'"). And the *Edwards* Court repeatedly cabined its holding with phrases like "mental derangement," 128 S. Ct. at 2386, "gray-area defendant," *id.* at 2385, "borderline-competent criminal defendant," *id.* at 2384, and, of course, "severe mental illness," *id.* at 2388. Edwards himself, after all, suffered from schizophrenia and delusions, not just a personality disorder. So even if we were to read *Edwards* to *require* counsel in certain cases—a dubious reading—the rule would only apply when the defendant is suffering from a "severe mental illness." Nothing in the opinion suggests that a court can deny a request for self-representation in the absence of this. Because there was no evidence before the trial court showing that Berry had such an affliction, *Edwards* was simply off the table.

One final word on *Edwards*. The careful reader will ask whether it even matters in federal court. *Edwards—Godinez* too—dealt with state court proceedings. And the Supreme

Court articulated its holding as a matter of what state courts may do, while remaining silent as to the powers of federal courts. *See Edwards*, 128 S. Ct. at 2388 ("[T]he Constitution permits *States* to insist upon representation by counsel for those competent enough to stand trial . . . but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves.") (emphasis added). Giving the case a literal reading, one would conclude that *Edwards* simply left the law undisturbed for purposes of federal criminal trials. But we don't think that's right. First, there is the matter of doctrinal consistency. Because both state and federal courts are bound to uphold the right to a fair trial (nixing trial of the mentally incompetent), *Drope*, 420 U.S. at 171-72; *Dusky*, 362 U.S. at 402; *Andrews*, 469 F.3d at 1117, and the right to self-representation, *Faretta*, 422 U.S. at 835; *see also* 28 U.S.C. § 1654, it follows that *Edwards* applies to the federal courts equally. Second, there is the fact that every court to consider *Edwards* in the context of a federal criminal trial has thus far taken it for granted that its holding controls. *See DeShazer*, 554 F.3d at 1289-90; *United States v. Garey*, 540 F.3d 1253, 1267 n.9 (11th Cir. 2008); *United States v. Back*, 2008 WL 5046442, *2-3 (6th Cir. Nov. 25, 2008) (unpublished); *United States v. Arenburg*, 2008 WL 3286444, *4-5 (W.D.N.Y. Aug. 7, 2008) (unpublished); *United States v. Dilley*, 2008 WL 3091263, *1-2 (N.D. Ind. Aug. 5, 2008) (unpublished); *United States v. Duncan*, 2008 WL 2954976, *2-3 (D. Idaho July 29, 2008) (unpublished). To do so does not rob the Court's reference to states of all meaning. There may be a distinction in terms of the *source* of a

federal court's power to block a gray-area defendant's self-representation request. A federal court probably enjoys this latitude as a product of its discretionary authority to handle proceedings (hence the review for an abuse of discretion), whereas a state court's authority may be driven by principles of federalism. In any event, we don't need to map out this rather theoretical distinction to determine that *Edwards* governs but that Berry can't take advantage of it.

In the trial judge's view—which we share—Berry was just a con man who couldn't quit, a swindler who "never dropped [ ]his mask." He tried to hustle the jury with the same story he told to his victims. But that doesn't mean he actually believed the story, and it certainly doesn't mean he suffered from a "severe mental illness." If a hustler could frustrate the trial process simply by keeping up pretenses, the prosecution of fraud would come crashing down all around us. No, what Berry had was just a case of extreme overconfidence. He told Dr. Nieberding that his high IQ—he put it at 171—allowed him to "run circles around most of the people in this country." Small wonder, then, that he thought he could fool the jury. A judge does not violate the Constitution when he allows a defendant like this to take his chances with self-representation.

The judgment of conviction is AFFIRMED.