# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2015-KA-00372-COA

JOHN KNIGHT                                                                    APPELLANT

v.

STATE OF MISSISSIPPI                                                           APPELLEE

DATE OF JUDGMENT:              02/28/2015
TRIAL JUDGE:                  HON. JAMES T. KITCHENS JR.
COURT FROM WHICH APPEALED:    LOWNDES COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:       OFFICE OF STATE PUBLIC DEFENDER
                              BY: W. DANIEL HINCHCLIFF
ATTORNEY FOR APPELLEE:        OFFICE OF THE ATTORNEY GENERAL
                              BY: KAYLYN HAVRILLA MCCLINTON
DISTRICT ATTORNEY:            SCOTT WINSTON COLOM
NATURE OF THE CASE:           CRIMINAL - FELONY
DISPOSITION:                  AFFIRMED - 02/12/2019
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

### EN BANC.

### WESTBROOKS, J., FOR THE COURT:

¶1.     A jury sitting before the Lowndes County Circuit Court found John Knight guilty of sexual battery of a minor.  After finding that Knight qualified for enhanced sentencing as a violent habitual offender, the circuit court sentenced him to life in the custody of the Mississippi Department of Corrections without eligibility for parole.  Knight appeals.  His appointed appellate attorney claims that although Knight chose to represent himself during the majority of his trial, he performed so poorly that the circuit court should have sua sponte declared a mistrial or forced Knight to step aside so his appointed trial counsel could take

over. Knight's attorney also claims that the jury's verdict is contrary to the overwhelming weight of the evidence, and the circuit court should not have allowed the prosecution to introduce pictures that a nurse took while examining the victim. Finding no error, we affirm.

### FACTS AND PROCEDURAL HISTORY

¶2. Knight's conviction stems from his inappropriate sexual contact with his twelve-year-old stepdaughter, Jane Smith.[1] In February 2007, Knight married Jane's mother, Rebecca. On April 18, 2007, Jane's aunt, Teresa Smith, took Jane to the emergency room at the Oktibbeha County Hospital. Teresa had reason to believe that Knight had been sexually abusing Jane. Based on Teresa's concerns, the hospital contacted the local Department of Human Services. Alexis Shumaker, a family protection worker, went to the hospital. She stayed there until Jane left the hospital. Thus, Shumaker was present while Jane was examined by Michelle Johnson, a Sexual Assault Nurse Examiner. Johnson's examination revealed that Jane had recent injuries consistent with sexual assault.

¶3. While Jane was still in the emergency room, she was visited by Detective David Criddle of the Columbus Police Department. Jane did not want to talk to him at that time. By the next morning, she had changed her mind. She told Detective Criddle that beginning in February 2007, Knight had been touching her inappropriately and having intercourse with her. She also said that Knight ran off with her on April 17, 2007, and he refused to return her until the following day. Jane told Detective Criddle that she and Knight had intercourse at the Budget Inn in Columbus after they checked in around 1 a.m. on April 18, 2007.

---

[1] To avoid the public disclosure of the minor victim's identity, we substitute aliases for her and her mother's names.

¶4.     Knight was subsequently indicted for sexual battery of a minor. A lengthy pretrial history followed. It took more than a year to apprehend Knight and extradite him from Louisiana. After pleading not guilty and being released on bond, Knight retained attorney Casey Lott. Lott filed a number of pretrial motions for Knight. He successfully asked the circuit court to subpoena Jane's records from the Columbus Police Department, the Starkville Police Department, the Oktibbeha County Hospital, and the Oktibbeha County Department of Human Services. The circuit court received those documents under seal but later allowed Lott to review them.

¶5.     Through one of several motions in limine, Lott wanted to explore a theory that Jane's vaginal injuries were caused by one of her cousins. According to Lott's motion, during a January 2007 appointment, Jane revealed "that she had been sexually abused by her cousin," but Rebecca did not press charges. The motion further said that Knight ran off with Jane on April 17, 2007, because he wanted authorities to prosecute her cousin.

¶6.     On April 7, 2011, the circuit court conducted a hearing on Lott's pending motions. Noting that Johnson's report suggested that Jane had an April 16, 2007 doctor's appointment,[2] Lott wanted to explore whether Jane had vaginal injuries before Knight ran off with her. If she did, Lott also wanted to determine whether Jane had attributed those

---

[2] Johnson's April 18, 2007 report says that Jane "was seen by PMD on 4-16-2007 and cultures were obtained." It also says that she "was seen by Dr. [Thomas] Pearson this week and he performed a pelvic exam as well as obtaining cultures, according to [Rebecca]. These were negative according to her as well but [Jane] was placed on doxycycline[, an antibiotic prescribed to treat a number of bacterial infections,] and is scheduled for a CT [scan] of her abdomen on Friday." However, the medical records never referenced Jane's cousin. There was no attempt to subpoena Dr. Pearson's medical records while the case was before the circuit court.

injuries to abuse by her cousin.

¶7. Jane explained that her cousin had molested her, but it was three or four years before Knight abused her. She said that in December 2006, she had seen a doctor for abdominal pain that was caused by inflammation of her mesenteric lymph nodes. She added that her abdominal pain was completely different than the vaginal pain that Knight's abuse caused. Jane also said that she had no memory of an April 16, 2007 doctor's appointment. The circuit judge ultimately held that Knight would not be allowed to present irrelevant evidence that Jane's cousin had molested her years before she met Knight.

¶8. After the April 2011 hearing, Lott's relationship with Knight began to deteriorate. About a month later, Lott moved to withdraw as counsel for Knight. Lott said that Knight insisted on pursuing imprudent objectives, he wanted Lott to "convey threatening messages to various law enforcement entities," and he wanted Lott to call the Lowndes County District Attorney as a witness "despite the fact that [he] was not a witness to any of the matters contained in the indictment." Lott also said that Knight had been leaving an average of thirty voicemails for him each night, and contrary to Lott's admonishments, Knight would not stop calling the prosecution and other agencies about his case. After a hearing,[3] Knight said that he still wanted Lott to represent him. The circuit judge warned Knight that Lott would be allowed to withdraw if Knight continued to ignore his advice.

---

[3] During the hearing, the circuit judge told Knight that Lott was "trying to keep [him] from spinning out of control in front of a jury . . . ." The circuit judge also told Knight: "[E]very time I've dealt with you in a courtroom, you're somewhat interesting to deal with. You're doing that at your own peril. And I think that's what your lawyer has been trying to tell you."

4

¶9.     Despite the circuit court's admonishments, Knight's behavior did not change. Approximately three months after the hearing on Lott's first motion to withdraw, Lott filed another motion to withdraw. Lott said that Knight disagreed about "several aspects" of his trial strategy; Knight no longer wanted his services; Knight insisted on imprudent and groundless objectives; and Knight continued to leave "dozens" of voicemails for him each night. After a hearing, the circuit court allowed Lott to withdraw. The circuit judge later found that Knight was indigent, so he appointed Steven Wallace as counsel for Knight.

¶10.    Knight's case was further delayed after he failed to appear at his August 29, 2012 trial.[4] He was later arrested in Louisiana and again extradited to Mississippi. During a January 2013 hearing, Knight continued to behave erratically. Like he had done during previous hearings, Knight rapidly transitioned between various complaints that the circuit court had repeatedly addressed. Eventually, the circuit court ordered Knight to undergo a mental evaluation.

¶11.    During Knight's July 31, 2014 competency hearing, Dr. Reb McMichael opined that Knight did not suffer from any mental illness or intellectual disability. Dr. McMichael said that Knight understood the proceedings against him, and he was capable of consulting with Wallace and helping with his defense. Dr. McMichael said that Knight often attempted to

---

[4] The record contains a large number of letters that Knight sent to Wallace and the circuit judge. Knight also filed numerous pro se motions. At one point, Knight lost his correspondence privileges because he was bargaining with other jail detainees so they would add his letters to their outgoing mail in violation of the jail's policy. Detailing every one of Knight's letters and the topics that he discussed within them would be a monumental task. It is enough to say that the letters clearly show that Knight increasingly began having the same problems with Wallace that he previously had with Lott.

"go off on tangents" during his evaluation, but Knight was "redirectable." According to the report that Dr. McMichael prepared along with Dr. Amanda Gugliano, a psychologist, "Knight's version of the circumstances surrounding his current legal predicament is not the product of delusional thinking, or any other major mental disorder, but is the result of his personality organization."

¶12. After Wallace's cross-examination, the circuit judge asked Dr. McMichael if there was any reason to think that Knight would not be able to assist Wallace with his case. Dr. McMichael responded that Knight "does not have a major mental disorder," but that he "may choose not to cooperate." Dr. McMichael added that Knight "is not an easy person to interact with," but that was not because Knight had a "mental disorder." Dr. McMichael then concluded by stating: "I spent two hours with [Knight] in May [a]nd an additional hour with him this morning. And I think that if he chooses to cooperate, [and] confer with [d]efense [c]ounsel, he is able to do that." The circuit court ultimately found that Knight was mentally competent.

¶13. Despite the fact that the prosecution had successfully moved to amend the indictment, the prosecution decided to "re-present" the case to a grand jury. The new indictment[5] alleged that in Lowndes County sometime between February 12 and April 18, 2007, Knight committed sexual battery by penetrating Jane's vagina with his penis. The new indictment also charged that Jane was younger than fourteen at the time of the sexual battery, and Knight was at least thirty-six months older than Jane. Finally, the new indictment alleged that

_____

[5] The prosecution subsequently nolle prosequied the original indictment.

Knight was eligible for enhanced sentencing as a violent habitual offender. Knight went before the circuit court again on November 14, 2014, for his live arraignment related to the new indictment. He immediately announced that he was "going pro se . . . ." After the new charge was read to him, Knight tried to file a motion to dismiss, but the circuit judge would not let him get off topic from his arraignment.

¶14. When the parties convened for Knight's trial on February 23, 2015,[6] Knight again said that he wanted to represent himself. Before the circuit judge could adequately address that subject, Knight began rapidly transitioning among a number of different arguments. The circuit judge said they were "just not sensible."[7] When the circuit court was finally able to get Knight back to his desire to represent himself, Knight said that he was literate, he had finished the eleventh grade, and he later obtained a GED. He did not have any specialized training in the law, but he said that he "read law books when [he] was in [the] Mississippi Department of Corrections . . . ." Immediately after he admitted that he had not "read any books on evidence," he tried to explain his problems with Wallace. The circuit judge got him back on track and noted that Knight had been declared mentally competent. When asked whether he had "looked at the law of sexual battery," Knight answered: "Yes, sir." While the circuit judge was trying to discuss the fact that Knight had "filed lots of things in the . . . Court files," Knight interrupted and complained that Wallace had not adequately tried to

[6] Wallace noted that Knight had refused the prosecution's offer to recommend a five-year sentence in exchange for Knight's guilty plea.

[7] Each time the circuit judge tried to explain his ruling on one subject, Knight would interrupt and switch to a different one.

7

subpoena witnesses. Wallace explained that he had diligently tried to subpoena witnesses but that Knight had been uncooperative and a witness who lived in Louisiana could not be compelled to attend Knight's trial. After much discussion that ranged among several topics, the circuit judge said:

> Mr. Knight, I think it would be in your best interest to keep Mr. Wallace . . . . I've been on [the] bench twelve years now, I can't remember how many people I've had represent themselves, it's probably not more than ten. It may not be more than five. But every one I've ever had who has represented themselves, has represented themselves into prison. They have been found guilty by a jury[,] [b]ecause they don't know what they're doing[.] Understand this, if I let you represent yourself, I have to hold you to the same standard on questions and objections that I do the State. . . . I can't . . . treat you differently. I can't say, ["W]ell gee[,] Mr. Knight doesn't know what he's doing, so therefore, he just gets to do things because he doesn't know what he's doing. . . .["] And, what I've learned in the years since I've [been] on the bench [is that] juries see that. And they hold that against you. They say, ["Y]ou know this guy is just making a mess of this.["] That's why I think it's best to have counsel. At least standby counsel . . . [t]hat . . . you can ask questions. Those kinds of things. But what I've learned is, even then, everybody who I've ever had to do that has always lost. They have been found guilty.

Knight said that he would accept standby counsel. He then immediately returned to his unrelated complaints. Later during the same preliminary hearing outside of the jury's presence, the circuit judge cautioned:

> Mr. Knight, if you keep behaving this way, I don't think it will take the jury two minutes to complete whatever deliberations they'll have to do. Whatever it is. I'm telling you if you continue to act this way, like you're acting, it's going to be to your detriment. . . . If you can control yourself and ask questions, and behave in a manner that's respectful to the witnesses and to the jury and all of that, . . . you may have a chance. But if you . . . behave the way you have been behaving, you're not going to help yourself[.]

¶15. Throughout the proceedings, Knight complained that he did not have copies of medical records from an appointment he thought Jane had on April 16, 2007. Wallace, the

8

prosecutor, and the circuit court spent a substantial amount of time trying to explain that there were no such documents in the sealed record,[8] but Knight refused to believe them. And despite the circuit court's ruling that it was irrelevant whether Jane's cousin had molested her three or four years before the conduct that led to Knight's charge, Knight repeatedly tried to inject the subject into the proceedings. Notwithstanding the circuit court's warnings and admonitions, Knight brought that up during his opening statement and every chance he got during his pro se cross-examination of the prosecution's witnesses. His efforts resulted in the jurors having to frequently leave the courtroom so the circuit court could address the circumstances that arose.

¶16.    The prosecution called Jane as its first witness. Jane testified that she was twelve when Rebecca married Knight during February 2007. She said that shortly after the marriage, Knight began kissing her, touching her inappropriately, and performing oral sex on her. She also testified that Knight bought lingerie for her and made her pose for pictures that he took with his phone. According to Jane, she and Knight had intercourse once at the home where she, Knight, and Rebecca lived in Lowndes County. Jane testified that Knight had threatened to kill her if she told anyone. She was also afraid that Rebecca would not believe her because Knight was "so good at manipulating that he would make [her] mother

---

[8] Knight had been given copies of all of Jane's medical records that were related to the allegations against him. There are simply no medical records from an April 16, 2007 appointment. Jane and Rebecca both testified that they could not remember Jane having an appointment on that date. No one subpoenaed Jane's records from Dr. Pearson's clinic, so there is no way to know for certain whether she had an appointment on that date. Regardless of whether she did, she unequivocally testified that her cousin had molested her years before the events that led to Knight's conviction.

believe that it wasn't true."

¶17. Regarding the events of April 17, 2007, Jane explained that Rebecca had allowed her to go with Knight while he ran an errand. After she and Knight left, Knight told her that he was not going to take her back. Jane said that after she and Knight checked into a room at the Budget Inn in Columbus, "it happened again." When asked what "it" meant, Jane answered "[r]ape." She added:

> I remember him on top of me. I remember him pacing back and forth in the room. I remember him not sleeping that night. That morning, when I woke up[,] I had bruises all over my legs that were not there prior. I was sore. I couldn't walk. I was in a lot of pain. I didn't know what was wrong with me but John was saying we have to go.

Jane also testified that Knight made her bathe before they left the Budget Inn.

¶18. Jane conceded that when she went to the emergency room, she initially refused to expose Knight. She said that before Knight dropped her off with her aunt, he threatened to kill her if she told anyone "what [he] did." But once she was assured that she was safe from Knight, who had reportedly driven through the hospital parking lot while Jane was in the emergency room, Jane decided to tell authorities what had happened.

¶19. The prosecution called six other witnesses. Rebecca and Teresa corroborated the fact that Knight had taken off with Jane and he refused to return her until the following day. Teresa also testified that she had called Knight and asked him to return Jane, but Knight refused and said that he "was f---ing" her. Officer Wade Beard of the Columbus Police Department testified that he encountered Knight and a young girl on April 17, 2007, and Knight asked him whether he could get into trouble if he did not return her to her mother.

10

Prakash Patel said that he owned the Budget Inn, and at 1 a.m. on April 18, 2007, he gave Knight a free room because Knight said his house had burned. Patel also said that Knight had a young female with him.

¶20. Johnson[9] testified that she examined Jane at the emergency room on April 18, 2007, and she found recent vaginal injuries consistent with sexual assault. She also found bruises on Jane's leg. According to Johnson, when she examined Jane in the emergency room, she got the impression that Jane was "enamored with" Knight, she "viewed him as her boyfriend," and she "was in love with him." Finally, Detective Criddle testified that after her initial apprehension, Jane told him that Knight had sexually abused her in February 2007. Jane also told him that on April 18, 2007, Knight performed oral sex on her and had intercourse with her while they were staying at the Budget Inn in Lowndes County.

¶21. Knight attempted to cross-examine all of the prosecution's witnesses. His efforts were largely ineffectual. He had to be reminded that he could not testify through his questions. He also seemed to believe that he should be acquitted if he could show that he was not constantly around Jane between February 12 and April 18, 2007. And as mentioned above, he frequently tried to inject the concept that Jane's cousin had molested her despite the circuit court's warnings and admonitions.

¶22. After the prosecution rested its case-in-chief, Knight called many of the same witnesses who had testified for the prosecution. Knight was allowed to call them once, but he did not understand that he could not recall them over and over again or repeatedly ask

---

[9] Johnson had married and taken the last name Melton by the time that Knight went to trial. For consistency, we refer to her as Johnson.

them the same questions. During a recess, Knight was taken to a hospital because he flopped to the floor of an elevator and refused to speak. The transcript indicates that there was nothing wrong with Knight.

¶23. When the proceedings resumed the following day, Knight chose to testify in narrative form. For the most part, his testimony is difficult to follow. Throughout all of the proceedings, the jury had to frequently leave the courtroom allowing the circuit judge to explain things to Knight or admonish him regarding various matters. The record suggests that Knight was merely being obstinate or that he did not understand the reasons for the circuit judge's rulings. He was not necessarily unruly or disruptive beyond that—at least not until the prosecution's closing argument, when he repeatedly blurted out that Jane's cousin "got away with it." When Knight would not follow the circuit judge's instructions to sit down and be quiet, the circuit judge told Knight to "shut his piehole" or he would be gagged.

¶24. The jury found Knight guilty of sexual battery. He was sentenced as a violent habitual offender to life without eligibility for parole or early release. He appeals.[10]

## DISCUSSION

### I. Knight's Participation in the Case

¶25. Knight's appointed counsel argues that as it became clear that Knight's self-

---

[10] Knight has filed nearly 175 pro se motions in this Court during the pendency of his appeal. He often attempted to raise substantive issues through his motions. This Court repeatedly explained that he needed to raise such issues through a brief rather than a motion. Since January 2017, Knight had reason to believe that his attorney would raise three issues on appeal. As of early December 2017, Knight has known that his attorney would stand on those three issues. On January 12, 2018, this Court gave Knight forty days to file a pro se supplemental brief. That deadline was subsequently extended to March 2, 2018. Although Knight was given ample opportunity to file a pro se supplemental brief, he never filed one.

representation was ineffectual, the circuit judge should have spontaneously declared a mistrial or forced Knight to step aside so Wallace could take over. "A criminal defendant has the right to be heard by himself or counsel or both." *Henley v. State*, 729 So. 2d 232, 236 (¶13) (Miss. 1998) (citing Miss. Const. art. 3, § 26). "A refusal by the trial court to permit the defendant to argue his case is a violation of his constitutional rights and requires reversal." *Id*. "The trial court's decision to allow pro se representation will be disturbed only upon a showing of abuse of discretion." *Smith v. State*, 221 So. 3d 1050, 1051 (¶4) (Miss. Ct. App. 2016) (quoting *Metcalf v. State*, 629 So. 2d 558, 566 (Miss. 1993)).

¶26.  Knight's attorney does not claim that Knight was mentally incompetent to defend himself or that he did not knowingly or intelligently decide to act pro se. If a criminal defendant insists that he wants to defend himself, it is unconstitutional for a state to "force a lawyer upon him." *Faretta v. California*, 422 U.S. 806, 807 (1975). "And although he may conduct his own defense ultimately to his own detriment, his choice must be honored . . . ." *Id*. at 834.

¶27.  In *United States v. Berry*, 565 F.3d 385, 386 (7th Cir. 2009), Jeffrey Berry decided to represent himself at his trial for fraud. After his "legal skills . . . proved unequal to the task," he argued that "the judge should not have allowed him to proceed pro se." *Id*. Berry filed "a slew" of pro se pretrial motions that the Seventh Circuit could "only generously call absurd." *Id*. at 387. "He burned through . . . attorneys . . . ." *Id*. at 388. And his mental competency exam resulted in the professional opinion that he "didn't exhibit any symptoms 'consistent with a mental disease or defect.'" *Id*. After explaining the pitfalls surrounding

13

self-representation, the trial judge was "[s]atisfied that Berry was making an informed choice, albeit a foolish one . . . ." *Id.* at 389.

¶28. At trial, Berry's "performance served as a distraction from the government's case, doing little (if anything) to undermine it." *Id.* The *Berry* court noted that "the right to self-representation cannot be denied merely because a defendant lacks legal knowledge or otherwise makes a poor advocate." *Id.* at 391 (citing *Faretta*, 422 U.S. at 834 n.46 ("[A] defendant who elects to represent himself cannot thereafter complain that the quality of his own defense amounted to a denial of 'effective assistance of counsel.'")). Consequently, the court held that "[a] judge does not violate the Constitution when he allows a defendant like [Berry] to take his chances with self-representation." *Id.* at 392.

¶29. Similarly, Knight cannot decide that he wants to represent himself and then, dissatisfied without the outcome, claim that the circuit court should have saved him from himself. We are not persuaded that the circuit court should have spontaneously declared a mistrial or forced Knight to step aside so Wallace could take over.[11] "[F]orcing a lawyer upon an unwilling defendant is contrary to his basic right to defend himself if he truly wants

---

[11] It should be noted that along with his substantial pretrial representation, Wallace contributed to Knight's efforts during the trial. Wallace conducted voir dire, raised an ore tenus motion in limine to exclude Johnson's photographs, made Knight's motion for a directed verdict, and handled the jury instruction conference. Wallace also stepped in numerous times during the trial to explain his efforts to satisfy Knight's demands or explain various points. He asked the circuit judge to be lenient after Knight repeatedly tried to get around the ruling that Knight would not be allowed to introduce evidence that Jane's cousin molested her when she was eight or nine years old. At times, he and Knight stepped out of the courtroom so they could confer. After Knight's trial, Wallace filed a post-trial motion for a judgment notwithstanding the verdict or a new trial. Wallace also perfected Knight's appeal.

14

to do so." *Farretta*, 422 U.S. at 817. Thus, we find that this issue is meritless.

## II. Jane's Birthday

¶30. Next, Knight argues that the jury's verdict is contrary to the overwhelming weight of the evidence because there was a discrepancy regarding Jane's birthday. The indictment charged Knight with sexual battery of a minor younger than fourteen years old. According to the indictment, Jane was born on December 18, 1994. But according to the transcript, Jane testified that she was born on December 18, 1984. Knight notes that the prosecutor said the same thing during her closing argument. Knight reasons that there was inadequate proof that Jane was younger than fourteen at the time of the offense.

¶31. "A motion for a new trial challenges the weight of the evidence." *Leonard v. State*, 972 So. 2d 24, 30 (¶22) (Miss. Ct. App. 2008). We will not disturb the jury's verdict unless it is "so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Powell v. State*, 249 So. 3d 355, 361 (¶36) (Miss. 2018). We "must accept as true the evidence which supports the verdict and will reverse only when convinced that the circuit court has abused its discretion in failing to grant a new trial." *Id*.

¶32. First and foremost, Knight's motion for a new trial merely said that Knight "was convicted against the overwhelming weight of the evidence." That general statement is not enough to preserve Knight's current claim on appeal. "A motion for a new trial must be specific." *Leonard*, 972 So. 2d at 30 (¶24). Otherwise, the issue is procedurally barred on appeal. *Id*. That principle certainly applies here.

15

¶33. Even Knight's current claim were not procedurally barred, we would not be persuaded by it. Despite Jane's apparent testimony that she was born on December 18, 1984,[12] which would have made her twenty-two years old during almost all of 2007, there was ample testimony that she was twelve years old at the time of the offense. Jane said that she was twenty years old when she testified during Knight's 2015 trial. Throughout her testimony, there were nine instances in which she said she was twelve during the events that led to Knight's conviction. Rebecca also said that Jane was twelve. Johnson said that the photographs she took depicted the "12[-]year[-]old patient that [she] saw in the emergency room." Detective Criddle said three times that Jane was twelve when he talked to her during 2007. And there were numerous references to Jane being a child at the time. Finally, the jury instruction on the elements of the offense said that in order to convict Knight, the jury had to find (among other things) that Jane's birthday was December 18, 1994. Based on the overwhelming testimony that Jane was twelve, it would not sanction an unconscionable injustice to uphold Knight's conviction.

### III. Johnson's Pictures

¶34. After the parties selected the jurors and the circuit judge excused them, Wallace verbally moved to prohibit the prosecution from introducing the closeup pictures of Jane's vagina that Johnson took during her examination. The pictures were relatively

---

[12] The transcript clearly contains a number of obvious typographical errors, so it is unclear whether the court reporter merely misheard or incorrectly transcribed Jane's testimony regarding the year she was born. Nevertheless, the transcript is presumed to be correct, Miss. Code Ann. § 9-13-43 (Rev. 2014), and neither of the parties attempted to correct it through Rule 10(e) of the Mississippi Rules of Appellate Procedure.

blurry—purportedly because they had been printed from electronic copies that were stored on a floppy disk. Additionally, Johnson had applied a blue dye to Jane's vagina to highlight the injuries that she discovered. According to Wallace, the prejudicial effect of the pictures outweighed their probative value. The circuit court denied Wallace's motion. Knight jumped in and began raising different claims, but when Wallace was able to return to the photographs, he argued that they were "very vague" and "dull." Wallace added that "the photograph" merely looked "like a blue blob" instead of "whatever it's supposed to look like." The circuit court ruled that the jurors could give the pictures "what weight they think." On appeal, Knight again urges that the probative value of the pictures is diminished by their relatively poor quality.

¶35. "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ." M.R.E. 403.[13] "The admissibility of photographs is a matter within the trial court's sound discretion." *Abeyta v. State*, 137 So. 3d 305, 313 (¶19) (Miss. 2014). "Photographs are admissible as long as they have an evidentiary purpose." *Id*. "But photographs that are gruesome, lack an evidentiary purpose, and serve only to inflame the passions of the jury should not be admitted." *Id*.

¶36. The pictures can certainly be described as prejudicial. "[A]ll probative evidence is by its very nature prejudicial." *United States v. Jefferson*, 751 F.3d 314, 320 (5th Cir. 2014). It was within the circuit court's discretion to find that the probative value of the pictures outweighed their prejudicial effect. The pictures helped the jury understand the injuries that

---

[13] The restyled Mississippi Rules of Evidence became effective on July 1, 2016. Because the changes were not substantive, we quote the current version of Rule 403.

Johnson found. And although the pictures are fairly blurry, they still would have been helpful to the jury; particularly given Johnson's testimony that the blue dye gathered in the areas that she discovered lacerations. "Some 'probative value' is the only requirement needed to buttress a trial judge's decision to allow photographs into evidence." *Lovejoy v. State*, 555 So. 2d 57, 59 (Miss. 1989). We are not persuaded by this issue.

## CONCLUSION

¶37. Knight chose to represent himself. He bears the consequences for his decision, and the circuit court was not obligated to rescue him from it. The jury's verdict is not contrary to the overwhelming weight of the evidence. And the circuit court acted within its discretion when it allowed the prosecution to introduce Johnson's pictures into evidence. Knight's conviction and sentence are affirmed.

¶38. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, TINDELL, McDONALD, LAWRENCE AND McCARTY, JJ., CONCUR.**