# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2017-KA-01488-COA

**FRANKIE L. WILLIAMS A/K/A FRANKIE**                    **APPELLANT**
**WILLIAMS A/K/A FRANKIE LEE WILLIAMS**

**v.**

**STATE OF MISSISSIPPI**                                          **APPELLEE**

DATE OF JUDGMENT:               11/06/2017
TRIAL JUDGE:                    HON. ISADORE W. PATRICK JR.
COURT FROM WHICH APPEALED:      SHARKEY COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:         OFFICE OF STATE PUBLIC DEFENDER
                                BY:  W. DANIEL HINCHCLIFF
ATTORNEYS FOR APPELLEE:         OFFICE OF THE ATTORNEY GENERAL
                                BY: KATY TAYLOR GERBER
                                    JASON L. DAVIS
DISTRICT ATTORNEY:              RICHARD EARL SMITH JR.
NATURE OF THE CASE:             CRIMINAL - FELONY
DISPOSITION:                    AFFIRMED - 04/30/2019
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

### BEFORE CARLTON, P.J., TINDELL AND McDONALD, JJ.

### CARLTON, P.J., FOR THE COURT:

¶1.     A Sharkey County grand jury indicted Frankie L. Williams for murder (Count I) and possession of a firearm by a convicted felon (Count II).  A unanimous jury found Williams guilty as charged.  The trial court sentenced Williams to serve life imprisonment for Count I and ten years for Count II in the custody of the Mississippi Department of Corrections (MDOC), with Williams's sentences to run concurrently.  On appeal, Williams asserts that (1) he is entitled to a new trial because the trial court violated his right to represent himself; and (2) he received ineffective assistance of counsel because his lawyer should have

stipulated to his prior felony conviction rather than allowing the State to offer the sentencing order into evidence. For the reasons addressed below, we affirm Williams's sentences and convictions. Based on the record, we find no merit to Williams's claim that the trial court violated his right of self-representation. We dismiss Williams's ineffective-assistance-of-counsel claim without prejudice so that he may pursue relief on this alleged error in a petition for post-conviction relief.

**STATEMENT OF THE FACTS AND COURSE OF PROCEEDINGS**

**I.      Relevant Pre-trial Proceedings**

¶2.     Prior to Williams's trial, his defense counsel filed a motion requesting that Williams undergo a mental evaluation to ascertain certain issues, including whether Williams suffered from any definable or recognizable mental conditions; whether Williams would be able to assist counsel in preparing a defense; and whether Williams was competent to stand trial. The trial court granted the motion. There was no request for an evaluation of whether Williams was competent to waive representation.

¶3.     In March 2017, after considering the psychological evaluation reports provided, the trial court ordered that Williams undergo additional mental evaluation, and, if deemed necessary and appropriate, that Williams be admitted and treated at the Mississippi State Hospital at Whitfield, Mississippi (Whitfield). At Williams's May 2017 competency hearing, the trial court stated, in relevant part, that according to the report from the doctors at Whitfield, Williams had the sufficient present ability to consult and work with his attorney with a reasonable degree of rational understanding in preparation of a defense. There was

2

no finding that Williams desired to waive counsel and represent himself. On the contrary, Williams raised the issue of obtaining a bond reduction so he could get his own attorney, rather than the lawyers appointed for him. The trial court told Williams that if he wanted a bond reduction, or new counsel, he would need to file a motion for that request. No motion was filed.

¶4.     Five months later, on the first day of trial, defense counsel told the trial court, "I think [Williams] wants to fire counsel." This statement was made out of Williams's presence and the following discussion then took place between counsel and the trial court:

COURT:     It[']s too late for that[,] and [Williams] is not qualified to represent himself. So, just tell him that we are going forward with the trial at this stage. I don't need to hear any more from him[.] I've heard enough from him. He has [two attorneys] who are able to represent him[,] and we are going forward unless he want[s] to plea.

DEFENSE:     No, he does not want to plea. Is it permissible for either me or him to make a motion before the [c]ourt that he be permitted to try himself?

. . . .

COURT:     I've seen enough [of h]is antics over the last four years to say that he is not qualified to serve as his own counsel. I mean[,] the record is [replete with] . . . motions that he has filed pro se. I have dealt with a lot of them trying to bend over backwards to understand his right to do that[,] but at some point[,] and we are at the point[,] . . . procedure has to take over. We are going . . . into trial and I cannot be here for two or three weeks trying to decipher what his motions are. Most of them . . . I have dealt with . . . as best that I could [while] not knowing what he was trying to say and what he was trying to ask for. But we are now at the edge of trial. I have a jury that is going to be selected. I have to procedurally proceed in a way that a higher court will be able to understand what I'm doing. And therefore his learned

3

attorneys are there to make sure that we do it within the rules of the [c]ourt[,] and we are going to do that. Now, I will respect all of his rights[,] and if he needs to ask a question[,] I will let you go back to the bench and ask whatever he wants to be asked of a witness. We will do that as best we can and as long as we don't [prolong] or get too far.

. . . .

COURT: . . . But I am again making the ruling that he cannot represent himself. The [c]ourt has over the last four years dealt with pro se motions from Mr. Williams that have made no sense at all[.] I won't say, no sense, but had no bearing at all in terms of what the law really is. And we have tried to accommodate him in that. We now are at the point that we are going to trial and we have to have a court record so that everyone understands what is going on. . . . [B]elieve me, whatever witnesses he wants to call, I'm going to let him call those witnesses. Whatever questions he wants to ask of those witnesses[,] he will ask through [counsel]. But I am not going to let him prolong this. We will be here two or three weeks with him trying to question a witness or even put forth any argument. Now, if you want me to say that to him, I will clear the courtroom and say that to him. But I am just saying that I can't let him make a forest of this trial here. [Counsel] will try this case and not him.

¶5. Later the same day, outside the hearing of the prospective jurors, the following exchange took place between Williams and the trial court:

WILLIAMS: [P]ertaining to the case that me and Mr. R[] and [Mr. D],[1] he said, for the record, that I had asked them to be excused but he said for some reason that—

COURT: Well, Mr. Williams[,] let me tell you what I told [counsel]. I am not—he has been appointed to represent you along with [co-counsel]. . . . [T]he [c]ourt is ruling that they are your attorneys. Now, I told them that if you have . . . something to ask that you tell . . . them what you want to ask and they will ask

---

[1] Rather than using their full names, we will refer to Williams's counsel as Mr. R and Mr. D.

4

that question[,] and if they think that it is improper then [they] will . . . tell me that is what you asked for and I will tell you whether or not I am going to allow that question to be asked. You understand how we are going to do it? . . . .

WILLIAMS: Well, it is pertaining to the point to (inaudible) with governing to have a file and your class or process against the law is to have what would be his true and understanding of what his physical factors concerning the State nor has the State determined to me that he is required to be governor or ruler of this case.

COURT: Governor?

WILLIAMS: For this fact, labor and—

COURT: Let me get something straight with you. Did you hear what I said Mr. Williams?

WILLIAMS: He feels that his value should be—

COURT: I'm going to let you ask whatever question you want to ask. But it will be through your attorneys and let the record reflect that I am telling you that. Any question that you want to ask of a witness or something like that then it will be asked by [your attorneys]. That is all I'm saying and if there is a dispute in terms of whether or not it can be asked then they will present that to the [c]ourt[,] and I will let you know my ruling . . . . And that is the procedure that I am using going forward. . . .

WILLIAMS: For the record, it is understanding that me and [Mr. R] are not in compliance of lawyer/client privilege.

COURT: . . . [Mr. R] is the attorney of record that has been on this case for the last two years or a year and a half and he is going to try it, along with [Mr. D], and anything that you want to ask, as I said before, that it will be asked through [them].

WILLIAMS: For the record, I don't feel satisfied with his judgment.

COURT: Yes, sir.

WILLIAMS: [O]fficially, . . . [Mr. R], acting by counsel, rules himself what

5

he wants to (inaudible).

. . . .

COUNSEL
(Mr. R):     He asked me to remove myself.

COURT:     The [c]ourt has ordered you . . . to try this case. Now, that is the order of the [c]ourt to try this case to the best of your ability which I know that you will do and that is all that the [c]ourt can ask you to do, along with [co-counsel].

## II.     The Trial

¶6.     The State's first witness was Roy Sias, the Assistant Chief of the Anguilla Police Department. He testified that around 9:00 p.m. on August 23, 2012, he responded to a shooting at the Double Luck Club in Anguilla, Mississippi. When Officer Sias arrived, a group of thirty-five to fifty people were gathered around a body on the street. The victim, who was later identified as Patrick Tate, had been fatally shot in the chest. Officer Sias testified that three or four people came forward, Frankie Williams was identified as the shooter, and Williams turned himself in to the police later that evening.

¶7.     The State's next witness was Investigator Charlie Hill, with the Mississippi Bureau of Investigations, who testified that he arrived the next morning to assist the Anguilla Police Department with the investigation. Investigator Hill testified that he was briefed on what had occurred the previous night, and then he took photographs of the scene and interviewed witnesses. He testified that a number of witnesses identified Williams as the shooter, and nothing about their statements caused him to question their credibility.

¶8.     Albert Lane testified as the State's next witness. He said that he knew both Patrick

6

Tate and Frankie Williams, and he testified that he was standing near the entrance of the Double Luck Club when Williams drove up, got out of his vehicle, and yelled for Anthony Singleton and Tate. Lane testified that he went inside the club to get Williams's brother, Archie Williams. According to Lane, when he went back outside, everything was over with and he "really didn't see nothing." The prosecutor asked Lane if Williams had anything in his hand, and Lane said, "I really didn't check." At that point, the prosecutor asked the court for permission to treat Lane as a hostile witness. Lane had given at least two prior statements in which he said that when Williams got out of the vehicle, he was holding a gun. The court granted the prosecutor's request, and the prosecutor impeached Lane with his prior statement. Lane then admitted that he saw Williams with a gun, he went into the club to get Frankie's brother, Archie, and when he came back outside, he saw Tate on the ground, dead.

¶9.     The State's next witness, Damarcus Jackson, testified that he had known Patrick Tate and Williams all his life. On the night of the shooting, he was in the parking lot of the Double Luck Club with Amanda Sherman before Williams arrived. Sherman was on the phone with Williams, who was her boyfriend at the time, and she kept saying, "Baby, I didn't get it." Shortly after the phone conversation ended, Sherman left the club, and Williams arrived five or six minutes later. Jackson testified that Williams jumped out of the vehicle with a gun and said, "I'm fin to kill some n[*****]s." Then he walked toward Tate and shot him. Afterward, Jackson testified that he and his cousin went over to Tate's body, on the ground. He testified that Tate was dead. Williams then drove by Tate's body and Jackson's cousin said [to Williams], "[M]an, what you done did[?]" Williams responded, "[T]he

7

n[*****] shouldn't [have] went [in] my house." Jackson believed that Williams "killed [Tate] over drugs."

¶10. Lisa Brown, the State's next witness, testified that she was also at the Double Luck Club that evening. Brown testified that she, Tate, and Singleton were talking in the parking lot when Williams drove by them, made a loop, and then parked in front of the club. Williams then got out of his car, approached Tate and Singleton with a gun, and said, "[Y]ou all punks MF[]s." Brown testified that she began running when she saw the gun and that when she looked behind her, she heard a gunshot. She then saw Tate attempt to run but then stumble to the ground. Brown testified that Williams got back in his vehicle, drove by Tate's body, and then fled the scene.

¶11. The State's next witness was Amanda Sherman. Williams is the father of Sherman's six-year-old son. Sherman testified that Williams called her on the evening of August 23, 2012, to ask if she had seen his drugs. Sherman testified that she told him, "No." She testified that Williams was upset when he called her and that he threatened to kill her. She hung up on him, he called back, and he said "Bitch, when I find you[,] I'm [going] to shoot you in your head." Sherman testified that after the shooting at the club, she asked Williams "why he kill that man," and "he said, that bullet was meant for you."

¶12. At this point in trial, the State called Miranda Williams, the Sharkey County Chancery and Circuit Clerk. Outside the presence of the jury, Ms. Williams authenticated the felony sentencing order on Williams's prior criminal conviction for the crime of simple assault on a police officer. The sentencing order was entered into evidence as the State's exhibit 10.

8

¶13. The State then called Dr. Lisa Funte, a state medical examiner. She testified that Tate died from a gunshot wound to his chest. According to Dr. Funte, Tate was facing the shooter and that the shot was fired from a distance of more than four feet away. Dr. Funte testified that the shot may not have caused immediate death, which was consistent with testimony that Tate attempted to run after being shot and then fell to the ground.

¶14. The State's final witness was Tommy Bishop, a forensic scientist specializing in firearms and tool-markings identification with the Mississippi Crime Laboratory. He testified that he received a projectile from the Medical Examiner's Office and that in his expert opinion the projectile was most likely shot from a .38 special revolver.

¶15. The defendant did not testify at trial, and the defense presented no other witnesses.

¶16. The jury found Williams guilty of murder (Count I) and felon in possession of a firearm (Count II). Williams filed a motion for a judgment notwithstanding the verdict or, in the alternative, a new trial, on October 24, 2017.[2] After a pre-sentencing investigation, the trial court sentenced Williams to serve life in prison for Count I and ten years in prison for Count II in the custody of MDOC. The court ordered Williams's sentences to run concurrently and further ordered that Williams pay fines, costs, and assessments in the amount of $1,584.50. Williams appeals.[3]

---

[2] No order was entered on the motion for a judgment notwithstanding the verdict or, in the alternative, a new trial; thus under Rule 25.3 of the Mississippi Rules of Criminal Procedure, that motion was deemed denied thirty days from the date it was filed.

[3] Williams filed a pro se motion seeking additional time to file a pro se supplemental appellant's brief, which was granted by the Mississippi Supreme Court on April 24, 2018. The order allowed Williams thirty days to file his supplemental appellant's brief and further provided that "[w]hen Williams files his pro se supplemental brief or his time to do so

9

**DISCUSSION**

## I.       Right to Self-Representation

¶17.    Williams asserts that he is entitled to a new trial because the trial court violated his right to represent himself. "Under the Mississippi and United States constitutions, a defendant has the right to waive the assistance of counsel and represent himself." *Coleman v. State*, 914 So. 2d 1254, 1255 (¶4) (Miss. Ct. App. 2005) (citing *Armstead v. State*, 716 So. 2d 576, 580 (¶19) (Miss. 1998)); *see also Faretta v. California*, 422 U.S. 806, 807 (1975). "'Because the right to self-representation is a constitutional guarantee under the Sixth Amendment, our standard of review is de novo.'" *Wash v. State*, 129 So. 3d 247, 250 (¶5) (Miss. Ct. App. 2013) (quoting *Hearn v. State*, 3 So. 3d 722, 732 (¶25) (Miss. 2008)).

¶18.    Williams was tried in October 2017, so Rule 7.1(c) of the Mississippi Rules of Criminal Procedure (effective as of July 1, 2017) provides the standards for allowing a defendant to represent himself. In particular, "[w]hen the court learns that a defendant desires to act as his[] own attorney, the court shall conduct an on-the-record examination of the defendant to determine if the defendant knowingly and voluntarily desires to act as his[] own attorney." MRCrP 7.1(c). Rule 7.1(c) further provides that the court is to advise the defendant of his rights and give the warnings itemized in Rule 7.1(c).[4] Once the court has

_____

expires, the State's briefing period shall reset." Williams did not file a pro se supplemental brief. Accordingly, by notice dated May 25, 2018, the Supreme Court Clerk notified the parties that briefing had resumed.

   [4] Rule 7.1(c) provides as follows:

The court shall inform the defendant that:

done so, "the court [must then] ascertain whether the defendant still wishes to proceed pro se or if the defendant desires an attorney to assist him[] in his[] defense." MRCrP 7.1(c). In the event "the defendant desires to proceed pro se, the court should determine whether the defendant has exercised this right knowingly and voluntarily and, if so, make the finding a matter of record." *Id.*; *see also Bradley v. State*, 58 So. 3d 1166, 1168-70 (¶¶7-10) (Miss. 2011).

¶19. As this Court observed in *Coleman v. State*, however, the Mississippi Supreme Court has set forth two exceptions to a defendant's right to waive counsel and represent himself, as follows: "(1) where the defendant is so unable or unwilling to abide by rules and courtroom procedure that his representation of himself would result in disruption of the trial;

> 1. The defendant has a right to an attorney, and if the defendant cannot afford an attorney, then the court will appoint one free of charge to defend or assist the defendant in his/her defense.
>
> 2. The defendant has the right to conduct the defense and may elect to do so and allow whatever role (s)he desires to his/her attorney.
>
> 3. The court will not relax or disregard the rules of evidence, procedure or courtroom protocol for the defendant and that the defendant will be bound by and have to conduct himself/herself within the same rules as an attorney, that these rules are not simple and that without legal advice his/her ability to defend himself/herself will be hampered.
>
> 4. The right to proceed pro se usually increases the likelihood of a trial outcome unfavorable to the defendant.
>
> 5. Other matters as the court deems appropriate.

MRCrP 7.1(c).

and (2) where the defendant is so physically or mentally incompetent to speak to the jury that his right to a fair trial is endangered." *Coleman*, 914 So. 2d at1255 (¶4) (citing *Armstead*, 716 So. 2d at 582 (¶25)).

¶20. We find no merit in Williams's contention that the trial court erred in failing to allow him to represent himself. First, in our review of the record we do not find that Williams expressly waived counsel, or requested that he be allowed to represent himself. This is a preliminary, necessary step that must take place before the requirements set forth in Rule 7.1(c) must be applied. *See* MRCrP 7.1(c) (providing that the procedure under the rule is to be used "[w]hen the court learns that a defendant desires to act as his/her own attorney. . . ."). At his competency hearing, Williams expressed his desire to get his own counsel rather than the counsel that the court appointed. The trial court told him at that time that he would have to file a motion with this request. The record on appeal does not contain any motion to substitute Williams's counsel.

¶21. Five months later, defense counsel told the trial court—out of Williams's presence—that he thought Williams "want[ed] to fire counsel." Williams was not present to either deny or agree with defense counsel's statement, and thus we find that this statement does not indicate that Williams desired to represent himself. *Cf. Dunn v. State*, 693 So. 2d 1333, 1341 (Miss. 1997) (holding that in light of defendant's silence when his counsel told the court on numerous occasions, in the defendant's presence, that the defendant wanted to represent himself, the "trial judge was fully justified in taking [defendant's] silence as admissions of his attorney's recitals").

¶22.   Later that same day Williams mentioned to the court that his counsel had informed him that they had told the court that he (Williams) "had asked them to be excused." The trial court explained to Williams that his appointed counsel would represent him. The court also told Williams that he could give any question that he wanted to ask to his lawyers, who would ask the question unless there was a dispute over whether the question was proper. In that case, the issue would be presented to the court, and the court would decide whether the question could be asked. Williams responded to this explanation as follows:

> Well, it is pertaining to the point to (inaudible) with governing to have a file and your class or process against the law is to have what would be his true and understanding of what his physical factors concerning the State nor has the State determined to me that he is required to be governor or ruler of this case.

We find that nothing in Williams's response indicated his desire to represent himself.

¶23.   We also observe that, as the dissent points out, Williams had two court-appointed lawyers at this time. We find that the transcript reflects that Williams only specifically refers to his dissatisfaction with one of them (Mr. R), as follows:

> WILLIAMS: For the record, it is understanding that me and Mr. R[] are not in compliance of lawyer/client privilege.
>
> COURT:      . . . Mr. R[] is the attorney of record that has been on this case for the last two years or a year and a half and he is going to try it, along with Mr. D[], and anything that you want to ask, as I said before, that it will be asked through Mr. R[] or through Mr. D[].
>
> WILLIAMS: For the record, I don't feel satisfied with his judgment.
>
> COURT:      Yes, sir.
>
> WILLIAMS: Officially, Mr. R[], acting by counsel, rules himself what he wants to (inaudible).

. . . .

COUNSEL
[MR. R]:     He asked me to remove myself.[5]

COURT:       The Court has ordered you to stay on this case, Mr. R[], to try this case. Now, that is the order of the Court to try this case to the best of your ability which I know that you will do and that is all that the Court can ask you to do, along with Mr. D[].

This exchange does not inform the trial judge that Williams desired to proceed pro se. Instead, this exchange reflects that although Williams may have wanted Mr. R removed as his counsel, he did not indicate his desire to represent himself or to remove Mr. D.

¶24.   Based upon our review of the record, although Williams expressed a desire to obtain different counsel, and perhaps to remove one of his lawyers, Williams did not waive counsel and invoke his right of self-representation.[6]  We therefore find no error in the trial court requiring defense counsel to continue representing Williams at trial.

¶25.   Second, even if the proceedings detailed above indicated that Williams wanted to proceed pro se, we find that the trial court did not err in refusing to allow him to do so

---

[5] Although Williams did not contradict this statement, his failure to do so is no indication that he also wanted Mr. D removed as his lawyer, or that he desired to represent himself.

[6] For comparison purposes, we observe that in *Patton v. State*, 34 So. 3d 563 (Miss. 2010), the court found that although the defendant did not expressly waive counsel, the record reflected that "Patton was strongly encouraged by the trial judge to obtain counsel, [but] he never did. Instead, he prepared and filed numerous pretrial motions, filed a witness list for trial, cross-examined the State's witnesses, and called witnesses of his own." *Id.* at 565 n.4.  Under these "narrow circumstances," the court held: "[W]e are satisfied that Patton's actions—coupled with the trial judge's several admonitions that he obtain counsel—amounted to a manifestation of his intent to waive his right to counsel." *Id.* at 565 (¶5).  These "narrow circumstances" are not present in Williams's case.

14

because the circumstances in this case meet the second *Armstead* exception. In particular, the record reflects that Williams was "so . . . mentally incompetent to speak to the jury that his right to a fair trial [would have been] endangered." *Armstead*, 716 So. 2d at 582 (¶25). In this case, after reviewing Williams's mental evaluation reports from the doctors at Whitfield, the trial court found that Williams was competent to stand trial. The United States Supreme Court has recognized, however, that a defendant may be deemed competent to stand trial but incompetent to represent himself. *See Indiana v. Edwards*, 554 U.S. 164, 167 (2008); *see also Hearn v. State*, 3 So. 3d 722, 736 (¶34) (Miss. 2008) (citing *Edwards* for the proposition that "the Constitution permits states to adopt a higher standard of competency for self-representation").

¶26. The exchange set forth above where Williams responded to the court's explanation of how the trial would be conducted supports the *Armstead* mentally incompetent exception.[7] The trial court also noted numerous motions filed by Williams that "made no sense at all." Although the court clarified this statement by saying, "I won't say *no sense*" (emphasis added), the court made clear that it often did not know "what [Williams] was trying to say and what [Williams] was trying to ask for" in his pleadings. The dissent likewise acknowledges the "obscure" nature of Williams's motions. In *Edwards*, the United States Supreme Court found that a defendant's impaired ability to express himself is a relevant

---

[7] For ease of reference, we reiterate that Williams responded, "Well, it is pertaining to the point to (inaudible) with governing to have a file and your class or process against the law is to have what would be his true and understanding of what his physical factors concerning the State nor has the State determined to me that he is required to be governor or ruler of this case."

15

factor in assessing his ability to represent himself, as follows:

> The American Psychiatric Association (APA) tells us (without dispute) in its amicus brief filed in support of neither party that "[d]isorganized thinking, deficits in sustaining attention and concentration, impaired expressive abilities, anxiety, and other common symptoms of severe mental illnesses can impair the defendant's ability to play the significantly expanded role required for self-representation even if he can play the lesser role of represented defendant." Brief for APA et al. as Amici Curiae 26. Motions and other documents that the defendant prepared in this case . . . suggest to a layperson the common sense of this general conclusion.

*Edwards*, 554 U.S. at 176; *see also* E. Lea Johnston, *Communication and Competence for Self-Representation*, 84 Fordham L. Rev. 2121, 2126 (2016) (noting that in *Edwards* "the [United States Supreme] Court highlighted the importance of a defendant's expressive ability and drew attention to Edwards's rambling and nonsensical motions, which revealed his disordered thinking").

¶27. We find that the record does not reflect a desire by Williams to waive counsel. However, even if it did, the factors discussed above support the *Armstead* exception that Williams was "so . . . mentally incompetent to speak to the jury that his right to a fair trial [would have been] endangered" had he represented himself. *Armstead*, 716 So. 2d at 582 (¶25). For this additional reason, we find no merit in this assignment of error.

## II. Ineffective Assistance of Counsel

¶28. Williams asserts that he received ineffective assistance of counsel because his lawyer did not stipulate to his prior felony conviction and instead allowed the State to introduce into evidence a copy of the sentencing order on that conviction to establish the prior convicted felon element of Count II, possession of a firearm by a convicted felon. For the reasons

16

explained in the paragraphs below, we dismiss Williams's ineffective-assistance-of-counsel claim without prejudice to his right to seek relief as to this claimed error in a properly filed petition for post-conviction relief. *See* Miss. Code Ann. § 99-39-7 (Rev. 2015) (providing that when the petitioner's conviction and sentence have been affirmed on direct appeal, the petitioner must obtain leave of the Mississippi Supreme Court before filing a petition for post-conviction relief in the circuit court).

¶29. Ordinarily, this Court does not consider claims of ineffective assistance of counsel when the claim is made on direct appeal "because there is usually insufficient evidence within the record to evaluate the claim." *Pustay v. State*, 221 So. 3d 320, 350 (¶97) (Miss. Ct. App. 2016). This Court will "only consider an ineffective-assistance-of-counsel claim on direct appeal when: (1) the record affirmatively shows ineffectiveness of constitutional dimensions, or (2) the parties stipulate that the record is adequate to allow the appellate court to make the finding without consideration of the findings of fact of the trial judge." *Nelson v. State*, 222 So. 3d 318, 322 (¶5) (Miss. Ct. App. 2017) (internal quotation mark omitted). In this case, both the State and Williams state in their appellate briefing that the record is sufficient to allow this Court to make the requisite determination on direct appeal. Nevertheless, our own review of the record indicates that Williams's assignment of error on this point is beyond the contents and face of the record. For this reason, we dismiss Williams's ineffective-assistance claim without prejudice to his right to file a motion for post-conviction relief on this alleged error.

¶30. To establish his ineffective-assistance claim, Williams must "prove, under the totality

17

of the circumstances that (1) his attorney's performance was defective and (2) the deficiency deprived the defendant of a fair trial." *Collins v. State*, 221 So. 3d 366, 372 (¶20) (Miss. Ct. App. 2016); *see Strickland v. Washington*, 466 U.S. 668, 687 (1984). Thus, a "defendant must demonstrate that his counsel's performance was deficient *and* that the deficiency prejudiced the defense of the case." *Brown v. State*, 798 So. 2d 481, 493 (¶14) (Miss. 2001). "Prejudice" in this context means that means that there "is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 494 (¶14). Finally, "[t]here is a strong presumption that counsel's performance falls within the range of reasonable professional assistance." *Collins*, 221 So. 3d at 372 (¶20) (quoting *Hiter v. State*, 660 So. 2d 961, 965 (Miss. 1995)).

¶31. We recognize that we have rejected ineffective-assistance-of-counsel claims under circumstances similar to those here. In *Collins*, for example, Collins asserted that he received ineffective assistance of counsel because his lawyer did not object to the State entering an order into evidence that showed that Collins had a prior felony conviction for aggravated assault. *Id.* at 372-73 (¶21). The order was offered and admitted in support of the State's possession-of-a-firearm-by-a-convicted-felon charges against him. *Id.* at (¶21); *see also id.* at 368 (¶1).

¶32. In addressing Collins's contentions, we recognized that a defense lawyer's failure to object under these circumstances "has been found to be a reasonable trial strategy." *Id.* at 372 (¶21). We further observed that "[t]his Court has stated that stipulating to the prior felony could give 'the jury the impression that the defen[se] had some reason to hide facts

18

of the prior cases from them.'" *Id.* (quoting *Williams v. State*, 819 So. 2d 532, 538 (¶18) (Miss. Ct. App. 2002)). On this basis we held that "[t]he decision not to stipulate to a prior felony was neither deficient nor prejudicial to Collins, and was reasonable trial strategy under the circumstances." *Id.* at 373 (¶21).[8]

¶33. Similarly, in *Williams*, we held that defense counsel "was under no duty to stipulate to . . . past convictions," 819 So. 2d at 538 (¶18), and found that the defendant's ineffective-counsel contentions in this regard did not rebut the "strong . . . presumption that the actions by defense counsel [are] reasonably strategic." *Id.* *See Reynolds v. State*, 136 So. 3d 452, 457 (¶11) (Miss. Ct. App. 2014). Recently, in *Page v. State*, No. 2016-KA-01464-COA, 2018 WL 3030923, at *5 (¶22) (Miss. Ct. App. June 19, 2018), we recognized that the failure to stipulate to a prior conviction "is not per se ineffective assistance of counsel." On this issue we observed that "[t]he decision not to stipulate not only avoids [the risk that the jury may believe the defense has something to hide] . . . but also puts the State to its burden of proof on each element of the crime [of felon-in-possession-of-a-firearm]." *Id.* Upon making this observation, this Court denied Page's ineffective-assistance-of-counsel claim "without

---

[8] We recognize that if the defense *offers* to stipulate to a prior conviction, the State should stipulate to that conviction in the prosecution of a felon-in-possession-of-a-firearm charge where other charges in the case are unrelated to the prior conviction. Under this scenario, "the trial court should accept the defendant's offer and grant a limiting instruction." *Williams v. State*, 991 So. 2d 593, 606 (¶40) (Miss. 2008). Further, "[i]t is especially important to allow a stipulation when a defendant is being prosecuted on multiple offenses [and] . . . the underlying conviction supporting a charge of possession-of-a firearm-by-[a]-felon is the same or similar to one of the other offenses charged." *Id.* at 606 (¶42). Under this scenario, "the prosecutor must articulate a reason to justify denying a defendant's offer to stipulate. The reason must illustrate why the probative value is not substantially outweighed by the potential prejudice [under Rule 403 of the Mississippi Rules of Evidence]." *Id.*

prejudice to Page's ability to raise the issue in a post-conviction proceeding." *Id.*

¶34. In this case Williams likewise asserts that he did not receive effective counsel because his lawyer did not stipulate to his prior felony conviction for simple assault on a police officer, instead of allowing the State to enter his sentencing order on this prior felony conviction in support of the felon-in-possession charge against him. Based on the authorities discussed above, we dismiss Williams's ineffective-assistance claim without prejudice to his right to pursue post-conviction relief as to this claimed error. Precedent reflects that defense counsel is not required to stipulate and that a decision not to do so could have been a matter of trial strategy or the defendant's choice. Such matters are beyond the contents and face of the record and are more appropriately considered upon petition for post-conviction relief.

¶35. **AFFIRMED.**

**BARNES, C.J., J. WILSON, P.J., GREENLEE, TINDELL, McDONALD, LAWRENCE AND C. WILSON, JJ., CONCUR. WESTBROOKS, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED BY McCARTY, J.**

**WESTBROOKS, J., CONCURRING IN PART AND DISSENTING IN PART:**

¶36. I concur with the majority's decision regarding the resolution of Williams's claim that he received ineffective assistance of counsel. But with utmost respect, I disagree with the majority's conclusion that Williams did not assert his choice to represent himself. After careful consideration, I would find that this Court must reverse the circuit court's judgment and remand this case for a new trial.

¶37. I do not reach this conclusion lightly. I have struggled with the facts and circumstances in this case because I completely understand the circuit court's decision not

20

to allow Williams to represent himself. There is an old adage—so old that no one is certain to whom it should be attributed—that someone "who represents himself has a fool for a client." Marshall H. Tanick & Phillip J. Trobaugh, *Lincoln's Minnesota Legacy*, Bench & Bar of Minn., Vol. 66, Issue 2, at 28 (2009). The United States Supreme Court has extended the adage to attorneys who undertake to represent themselves. *Kay v. Ehrler*, 499 U.S. 432, 438 (1991). If this adage is true for one who has been trained and presumed to have the legal aptitude to be competent in court, then surely it doubly applies to someone who lacks the necessary education, training, and skill set to represent *anyone* in court; especially himself. Williams almost certainly lacks the skills, knowledge, and legal acumen required for the task. It probably would not be unreasonable to conclude that Williams's interest in self-representation was primarily a means to prolong his trial. But the law is more significant than my personal views on the wisdom or intent of Williams's decision.

¶38. In Mississippi, a criminal defendant has a constitutional right "to be heard by himself or counsel or both." Miss. Const. art. 3, § 26. "[F]orcing a lawyer upon an unwilling defendant is contrary to his basic right to defend himself if he truly wants to do so." *Faretta v. California*, 422 U.S. 806, 817 (1975).

> It is undeniable that in most criminal prosecutions defendants could better defend with counsel's guidance than by their own unskilled efforts. But where the defendant will not voluntarily accept representation by counsel, the potential advantage of a lawyer's training and experience can be realized, if at all, only imperfectly. To force a lawyer on a defendant can only lead him to believe that the law contrives against him. Moreover, it is not inconceivable that in some rare instances, the defendant might in fact present his case more effectively by conducting his own defense. Personal liberties are not rooted in the law of averages. The right to defend is personal. The defendant, and not his lawyer or the State, will bear the personal consequences of a

21

conviction. It is the defendant, therefore, who must be free personally to decide whether in his particular case counsel is to his advantage. And although he may conduct his own defense ultimately to his own detriment, his choice must be honored out of that respect for the individual which is the lifeblood of the law.

*Id*. at 834 (internal quotation marks omitted). "A refusal by the trial court to permit the defendant to argue his case is a violation of his constitutional rights and requires reversal." *Henley v. State*, 729 So. 2d 232, 236 (¶13) (Miss. 1998). In short, the law is clear that a defendant has a right to make what will almost certainly be a bad decision.

¶39. Williams was indicted on January 7, 2013. In September 2013, Williams's first appointed attorney filed a motion for a mental evaluation. The circuit court entered an order granting that motion the day after counsel filed it. The motion did not indicate that counsel had problems communicating with Williams, but Williams's pro se motions suggest that may have been the case. His pro se motion for a bond reduction said:

Here you would see that my name is Frankie L. Williams Sr. in which, shall show and Undeniable excellent by sight, so with the harmony of this conduct any or no cause for embarrassment, shall show no mean for any court courtesies without the act of terrorism, in which as a noble man by my Masonic Freedom an inherent of high antiquity, so I pray a request for Bond Reduction be granted, because an cause for fetter is not any mean of transformation, an if any court, would not show cause for this reduction would enter a mental rude state, in which an court by the passion of there dress by the character, would show by the art of change as a commodities for the invention of a social life, so with the due cause of my request, the court find cause for this request for Bond Reduction, by the cause of 1999 terrorism act an a mean of prejudice, shall show as sight if this request is not succeeded. An any cause for repentance, shall show the social character of every state of mind, so any cause of virtue shall show a mean of over sight.

Through his subsequent pro se "motion for emergency hearing," Williams said: "I . . . come here to the Circuit Court . . . to request a, Motion for And Emergency Hearing, whereas I

22

need to discuss a mental imbalance, whereas incompetent as counsel, by misconduct to show her/his duty as respectability as a conduct of counsel, as a Action of Void as counselling." Williams filed numerous other pro se motions that were similarly obscure.

¶40. Williams had multiple appointments with Dr. Criss Lott. Before Dr. Lott submitted his report, Williams's defense counsel successfully moved to withdraw due to her "irreparably damaged" relationship with Williams. The circuit court appointed new counsel for Williams.

¶41. The circuit court conducted a competency hearing during May 2017. If Dr. Lott's appointments resulted in multiple reports, they are not in the record. Instead, the circuit court referred to a singular report and either quoted or paraphrased its contents. The transcript does not contain any reference to a mental-illness diagnosis or anything to suggest that Williams was delusional. The transcript merely relays Dr. Lott's apparent conclusion that Williams was mentally competent to aid in his defense. During the same hearing, Williams mentioned that he wanted to get a different attorney. He also said that if he was able to get a reduced bond, he "would have a better chance of defending this." Although he was invited to do so, Williams did not clarify whether he meant that he wanted to represent himself.

¶42. That had clearly changed when the parties convened for Williams's October 2017 trial. The trial transcript begins with an in-chambers conference and the circuit court's recognition that Williams was wearing an orange jumpsuit because he refused to wear "regular clothes." Williams must have been absent from the discussion because his attorney said that Williams wanted to talk to the circuit judge, who responded that he did not "need

23

to hear from" Williams. Counsel then announced his impression that Williams wanted to "fire counsel." As the majority notes, the circuit judge said—among other things—that it was "too late for that and [Williams] is not qualified to represent himself." Defense counsel asked if he or Williams could move for Williams's permission to "*try himself*," but the circuit court said that Williams was "not going to do that." (Emphasis added). The circuit judge went on to explain that his decision was based on his prior experience with Williams, the difficulty involved in deciphering Williams's pro se motions, and the avoidance of unnecessary delay.

¶43. The subject of Williams's self-representation came up again later in Williams's presence. The exchange is quoted in the majority opinion, so there is no need to repeat it here. Although Williams did not communicate well, he unequivocally said that he was not "satisfied with [his attorney's] judgment,"[9] and Williams did not correct his attorney when he said that Williams "asked [counsel] to remove [him]self." So to summarize, counsel for Williams said that Williams wanted to "fire counsel," the circuit court declined to hear from Williams and said that he was not qualified to represent himself, counsel indicated that Williams wanted to "try himself," Williams later said that he was not satisfied with his attorney's judgment, and he apparently agreed with counsel's statement that Williams did not want his attorney in the courtroom.

¶44. The Mississippi Rules of Criminal Procedure became effective on July 1, 2017.

---

[9] Williams had two appointed attorneys at that time. The record is unclear whether Williams had any specific disagreements with both of his appointed attorneys, but the circuit court's earlier statement that Williams was not qualified to represent himself shows that the circuit court was under the impression that Williams wanted to act pro se.

Under Rule 7.1(c), "[w]hen the court learns that a defendant desires to act as his . . . own attorney, the court *shall* conduct an on-the-record examination of the defendant to determine if the defendant knowingly and voluntarily desires to act as his/her own attorney." (Emphasis added). The rule does not say that a criminal defendant has to personally announce his desire to represent himself. Instead, it *requires* an "on-the-record examination of the defendant" when the court "learns that a defendant" wants to act pro se. Here, Williams's counsel articulated that Williams wanted to "*try himself,*" and the circuit court clearly thought that Williams wanted to represent himself. It follows that the circuit court was obligated to examine Williams and discuss the subjects that are further set forth in Rule 7.1(c). The majority suggests that a trial court can summarily sidestep the rule. It may be that the trial court's prior experience with the defendant will align with the conclusion that the defendant has not "knowingly and voluntarily" chosen to proceed pro se, which is all the rule requires, but I do not interpret the examination required by the rule as an empty ritual that can be set aside.

¶45. The charges against Williams had been pending for more than four years, and the circuit court was unquestionably very familiar with Williams when it learned of Williams's eleventh-hour desire to represent himself. A circuit judge would be justifiably frustrated under the circumstances, but I do not think that is the case here. The record and transcripts clearly show that the circuit court was consistently patient with Williams and exhibited model judicial temperament and restraint when dealing with him during pretrial hearings. I completely agree with the circuit court's characterization that it bent "over backwards" when

25

interpreting Williams's pro se motions.

¶46.   Even so, when the circuit court learned that Williams wanted to represent himself, the Mississippi Constitution and Rule 7.1(c) obligated the court to determine that Williams was fully informed about his rights (and the potential consequences of exercising them) and then resolve whether Williams knowingly and voluntarily chose to waive his right to the assistance of counsel.  The majority's conclusion that Williams was mentally incompetent to represent himself is premature[10] and beyond the scope of this Court's authority to make. All we know is that Williams was declared mentally competent to assist in his defense.  This Court has no original jurisdiction to conclude that Williams was mentally incompetent to represent himself; the circuit court merely said that Williams was "not qualified to serve as his own counsel," and it was difficult to decipher his pro se motions.

¶47.   In *Indiana v. Edwards*, 554 U.S. 164, 167 (2008), the defendant was originally declared mentally incompetent.  The trial court subsequently found that the defendant was

---

[10] The conclusion that Williams would not observe court decorum is likewise premature because the circuit court never found that to be the case.  It is also not the complete test to determine whether a defendant may represent himself.  In *Armstead v. State*, 716 So. 2d 576, 582 (¶25) (Miss. 1998), the Mississippi Supreme Court noted that the right to self-representation is not available to a defendant who "is so unable or unwilling to abide by rules of procedure and courtroom protocol that the 'partial waiver' solution outlined in *Jones* [*v. Barnes*, 463 U.S. 745 (1983),] is inadequate to prevent a disruption of the trial." *Armstead* also relied on the statement in *Faretta*, 422 U.S. at 834 n.46, that a "trial judge may *terminate* self-representation by a defendant who deliberately engages in serious and obstructionist misconduct."  (Emphasis added).  According to the State, Williams's refusal to observe court rules and decorum is evident because he refused to wear anything but his orange jumpsuit, and refused to stand during the presentment of the indictment. Notwithstanding that Williams was never given the opportunity to represent himself and the latter event happened well *after* his request had been summarily denied, neither event referenced by the State rises to the level of "disruption" or "serious and obstructionist misconduct."

26

competent, and then went back to the conclusion that he was not mentally competent. *Id*. at 168. The defendant had also been diagnosed with schizophrenia. *Id*. at 169. Ultimately, the United States Supreme Court held that states may "insist upon representation by counsel for those competent enough to stand trial . . . but who still suffer from *severe mental illness* to the point where they are not competent to conduct trial proceedings by themselves." *Id*. at 178 (emphasis added); *accord Hearn v. State*, 3 So. 3d 722, 736 (¶34) (Miss. 2008). There is nothing in the record to support the conclusion that Williams had been diagnosed with a "severe mental illness."

¶48.    In effect, Williams was deprived of his constitutional right to represent himself. As a result, this Court should follow the well-established precedent of the United States Supreme Court in *Faretta*, 422 U.S. 836, reverse Williams's conviction, and remand this case for a new trial. The logistics of my decision are not lost on me. It is very likely that Williams would represent himself right into the same result. In *United States v. Berry*, 565 F.3d 385, 386 (7th Cir. 2009), Jeffrey Berry decided to represent himself at his trial for fraud. After his "legal skills . . . proved unequal to the task," he argued that "the judge should not have allowed him to proceed pro se." *Id*. Berry filed "a slew" of pro se pretrial motions that the Seventh Circuit could "only generously call absurd." *Id*. at 387. "He burned through . . . attorneys . . . ." *Id*. at 388. And his mental competency exam resulted in the professional opinion that he "didn't exhibit any symptoms 'consistent with a mental disease or defect.'" *Id*.    After explaining the pitfalls surrounding self-representation, the trial judge was "[s]atisfied that Berry was making an informed choice, albeit a foolish one . . . ." *Id*. at 389.

27

¶49. At trial, Berry's "performance served as a distraction from the government's case, doing little (if anything) to undermine it." *Id*. The *Berry* court noted that "the right to self-representation cannot be denied merely because a defendant lacks legal knowledge or otherwise makes a poor advocate." *Id*. at 391 (citing *Faretta*, 422 U.S. at 834 n.46 ("[A] defendant who elects to represent himself cannot thereafter complain that the quality of his own defense amounted to a denial of 'effective assistance of counsel.'")). Consequently, the court held that "[a] judge does not violate the Constitution when he allows a defendant like [Berry] to take his chances with self-representation." *Id*. at 392.

¶50. Alternatively, Williams could see the wisdom of having an attorney's traditional or hybrid assistance during a new trial and choose not to exercise his right of pure self-representation. A proper examination could reveal that Williams had not knowingly and voluntarily waived the right to counsel. With proper supporting evidence, the circuit court could even conclude that Williams was not mentally competent to act pro se despite being mentally competent to aid in his defense. But as it currently stands, Williams was summarily deprived of his constitutional right to make what would almost certainly be a bad choice, and the United States Supreme Court has held that the result is reversible error. Accordingly, I must respectfully dissent in part from the majority's decision.

**McCARTY, J., JOINS THIS OPINION.**